UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

—————————————————————

GF INDUSTRIES OF MISSOURI, LLC,                :
               Plaintiff,                :
                                  :
       v.                :      No.   5:22-cv-0227
                                  :
LEHIGH VALLEY GENOMICS, LLC,                :
              Defendant.                :

—————————————————————

## O P I N I O N

**GF Industries of Missouri's Motion for Partial Summary Judgment, ECF No. 26 – Denied**
**Lehigh Valley Genomics' Motion for Summary Judgment, ECF No. 27 – Granted in Part,**
**Denied in Part**

**Joseph F. Leeson, Jr.**                                  **November 2, 2022**
**United States District Judge**

## I.     INTRODUCTION

     This matter involves the termination of a contractual relationship between the parties.

Plaintiff GF Industries of Missouri, LLC ("GFIM") alleges that Defendant Lehigh Valley

Genomics, LLC ("LVG") breached their agreement, was unjustly enriched in the process, and

terminated their agreement on the basis of race in violation of 42 U.S.C. § 1981. LVG also

alleges that GFIM breached their agreement.

     Both parties have filed the present motions for summary judgment. After a review of the

record and briefing, and for the reasons set forth below, this Court denies GFIM's motion for

partial summary judgment and grants in part and denies in part LVG's motion for summary

judgment.

## II.   UNDISPUTED MATERIAL FACTS

Plaintiff GFIM is a business that markets the services of various entities, including labs that provide genetic and molecular testing.  Def. Stmt. Mat. Facts ("DSMF") ¶ 4, ECF No. 27; Pl. Compl. ¶ 6.  GFIM's sole owner and president is Lee Binion, a Black man.  Pl. Compl. ¶ 34. Defendant LVG is a clinical laboratory that offers molecular and genetic testing services to healthcare providers.  Pl. Compl., Exhibit A ("Agreement") at 1; DSMF ¶ 1.  LVG is co-owned by Lisa Jackson and Dr. Anil Desphande, and Jackson also acts as the lab's Managing Partner. Contract at 1; DSMF ¶ 2-3.

On May 1, 2021, LVG and GFIM entered into a Development and Marketing Services Agreement (the "Agreement") wherein GFIM agreed to market LVG's services to medical providers for a period of twelve months. *See* Agreement at 1.  The Managing Partner signed the Agreement on behalf of LVG, and Binion on behalf of GFIM.  *See* Agreement at 11. Although the Agreement did not specifically require any numerical business targets, GFIM was required to perform the following non-exhaustive list of services: (1) "Sales and Growth"; (2) Education and Product Training – Develop and retain the necessary product/services knowledge required to properly train and educate customers on the products and services offered by LVG"; (3) "Distribution management services – Assist with and coordinate the day-to-day interactions with various vendors and suppliers who send testing kits and specimens to the lab and/or who consult with patients who desire to have certain tests performed"; (4) "Account management – performance reviews of various/service providers; assessing new/additional vendors/new services providers; periodic education"; and (5) "Quality Initiatives."  Agreement, Exhibit A; Pl. Stmt. Mat. Facts ("PSMF") ¶ 14, ECF No. 26; DSMF ¶¶ 31, 41.

In exchange for these services, the Agreement provided that GFIM would be compensated $100,000 per month, with the first three months as the "startup period," after which the compensation amount could be renegotiated.  Agreement at 3; DSMF ¶¶ 28, 32.  Any compensation adjustment following the start-up period was required by the Agreement to be in a signed writing.  Agreement at 3; DSMF ¶ 32.  Further, the Agreement contained an integration clause, and any amendments to the Agreement were required to be in a writing executed by both parties. Agreement at 4, 8; DSMF ¶¶ 33, 34. No written modifications were ever made to the Agreement. DSMF ¶ 36; Def. MSJ, Exhibit C ("Binion Dep.") 90:24-91:1.

At some point in May 2021, Binion had conversations with LVG's Director of Billing, about establishing a bonus structure in addition to his compensation arrangement in the Agreement.  *See* DSMF ¶¶ 40, 42.  The Director of Billing has notes from her conversations with Binion which suggest that a bonus was discussed, as well as business targets for GFIM to reach in order to receive the bonus. Avery Dep., Exhibits.  No performance bonus structure or amendment to the Agreement was ever reduced to a signed writing.  DSMF ¶¶ 36, 37; Binion Dep. at 142:7-9.  However, the following month, at the Managing Partner's directive, GFIM was paid an additional $100,000 outside of its contractual compensation amount.  DSMF ¶ 51. LVG's accountant confirmed that he was directed to send this payment by the Managing Partner and, as LVG's accountant, he was limited from wiring more than $100,000 per day.  Pl. Resp., Exhibit G ("Harris Dep.") 3:9-16, 17:25, 18:2.  In text messages from the Managing Director to LVG's accountant, the Managing Partner refers to the payment as a "bonus" to be paid "[u]ntil [in-house counsel] and I create the official contract."  Harris Dep. 13:9-16; Def. MSJ, Exhibit K. Outside of the regularly scheduled monthly payment from the Agreement, the June 2021

payment was the only additional payment made to GFIM during its relationship with LVG. DSMF ¶ 54.

On November 4, 2021, LVG gave GFIM a 15-day notice of termination.  DSMF ¶ 71. Pursuant to the Agreement, either party could terminate the relationship for any reason with a 15-day notice.  Agreement at 6.  Accordingly, the Agreement was terminated on November 19, 2021.  DSMF ¶ 72.  During the parties' relationship and after it had ended, insurers informed LVG that it would not be reimbursed for several samples, initially procured by GFIM, due to missing medical records.[1] Def. MSJ, Exhibit B ("Jackson Dep.") 177:13-23.

## III.   PROCEDURAL HISTORY

On January 18, 2022, GFIM filed the instant matter in this Court.  *See* Pl. Compl., ECF No. 1.  The Complaint alleges that LVG (1) entered into an oral bonus agreement with GFIM which LVG later breached by failing to make additional bonus payments, (2) was unjustly enriched by GFIM's services, and (3) terminated the Agreement with GFIM on the basis of Binion's race, in violation of 42 U.S.C. § 1981. Pl. Compl.  Defendant LVG filed an Answer to the Complaint on March 23, 2022, which included a Counterclaim against GFIM for breach of contract.  *See* Def. Ans., ECF No. 8.  The Counterclaim alleges that GFIM breached the Agreement by failing to supply the necessary medical records from physicians when submitting patient samples to LVG's lab for testing, among other things.  *See* Def. Ans.  On April 9, 2022, GFIM filed an Answer to LVG's Counterclaim, and the period of fact discovery began shortly thereafter.  *See* Pl. Ans., ECF No. 10; Sched. Order, ECF No. 13.  At the close of fact discovery, both parties moved for summary judgment.  *See* Pl. MSJ, ECF No. 26; Def. MSJ, ECF No. 27.

---

[1]      Further disputed facts surrounding the nature of the Agreement's termination are included on an as-needed basis in this Court's discussion below.

Following a series of responses and replies, the motions are now ready for review.  *See* Def.

Resp., ECF No. 28; Pl. Resp., ECF No. 29; Pl. Reply, ECF No. 32; Def. Reply, ECF No. 33.

In support of its motion for partial summary judgment, GFIM argues that LVG's counterclaim for breach of contract fails as a matter of law under the parol evidence rule, or in the alternative, damages are unsupported by facts in the Record. Pl. MSJ.  In support of its motion for summary judgment on all of Plaintiff's claims, LVG argues that (1) the written Agreement exclusively controls the parties' relationship and the parties never agreed to a different compensation arrangement, (2) GFIM's unjust enrichment claim fails as a matter of law, and (3) LVG's decision to terminate GFIM was not racially motivated and did not violate 42 U.S.C. § 1981.  Def. MSJ.  Each motion is addressed in turn below, and ultimately, GFIM's motion is denied, and LVG's motion is granted in part and denied in part.

## IV.    LEGAL STANDARDS

### A.    Motion for Summary Judgment – Review of Applicable Law

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A disputed fact is "material" if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See id.* at 257.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific

material facts which give rise to a genuine issue.  FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 324;

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the

non-moving party "must do more than simply show that there is some metaphysical doubt as to

the material facts").  The party opposing the motion must produce evidence to show the

existence of every element essential to its case, which it bears the burden of proving at trial,

because "a complete failure of proof concerning an essential element of the nonmoving party's

case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  The court must

consider the evidence in the light most favorable to the non-moving party.  *Scott v. Harris*, 550

U.S. 372, 378 (2007).

### B.    Breach of Contract – Review of Applicable Law

To prevail on a breach of contract claim, the party seeking to enforce the contract must

establish: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty

imposed by the contract, and (3) resultant damages."  *Ware v. Rodale Press, Inc.*, 322 F.3d 218,

225 (3d Cir. 2003) (internal marks omitted) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d

1053, 1058 (Pa. Super. Ct. 1999)).  Moreover, in order to recover damages for a breach of

contract in Pennsylvania, a causal connection must be established between the breach and the

loss.  *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 231 (3d Cir. 1995) (citing *Logan v.

Mirror Printing Co.*, 600 A.2d 225, 226 (Pa. Super. Ct. 1991)).

### C.    Modification of a Contract – Review of Applicable Law

In Pennsylvania, it is longstanding that a written contract for services can be modified

orally, even when the contract provides that it may only be modified in writing.  *Universal

Builders, Inc. v. Moon Motor Lodge, Inc.*, 244 A.2d 10, 15 (Pa. 1968) (citations omitted).  *See

MDNet, Inc. v. Pharmacia Corp.*, 147 Fed. Appx. 239, 243 (3d Cir. 2005) ("Where a

requirement is contained in a former contract, the parties may waive the requirement by a later

oral modification of the former contract.  Parties may orally agree to modify a written contract,

even where the written contract contains language prohibiting oral modifications.").  For an oral

modification to be enforced, the modification "must be proved by clear, precise and convincing

evidence, including conduct by the parties that clearly shows the intent to waive the requirement

that the amendments be made in writing."  *MDNet*, 147 Fed. Appx. at 243-44 (internal quotation

and citation omitted).  This burden is not taken lightly, and as the Pennsylvania Supreme Court

has explained,

> [a]n oral contract changing the terms of a written contract must be
> of such specificity and directness as to leave no doubt of the
> intention of the parties to change what they had previously
> solemnized by a formal document.  The oral evidence must be of
> such a persuasive character that it moves like an ink eradicator
> across the written paper, leaving it blank so that the parties in effect
> start afresh in their negotiations and mutual commitments.

*Gloeckner v. School Dist. of Baldwin Twp.*, 175 A.2d 73, 75 (Pa. 1961).

### D.    Agency – Review of Applicable Law

"Whether an agency relationship exists is a question of fact."  *Volunteer Fire Co. v.*

*Hilltop Oil Co.*, 602 A.2d 1348, 1351 (Pa. Super. 1992) (citation omitted).  Creating an agency

relationship does not require any "special formalities[,]" and the party asserting the existence of

an agency relationship "need not furnish direct proof of specific authority, provided it can be

inferred from the facts that at least an implied intention to create the relationship of principal and

agent existed."  *B & L Asphalt Indus. v. Fusco*, 753 A.2d 264, 269 (Pa. Super. 2000) (internal

quotation and citations omitted).

Under Pennsylvania law, authority given to an agent can be express, implied, apparent, or

by estoppel. *Volunteer Fire Co.*, 602 A.2d at 1352.  Express authority is defined as authority

"directly granted by the principal to bind the principal as to certain matters;" and implied authority is that which "bind[s] the principal to those acts of the agent that are necessary, proper and usual in the exercise of the agent's express authority[.]" *Bolus v. United Penn Bank*, 525 A.2d 1215, 1221 (Pa. Super. 1987).  Therefore, both express and implied authority necessitate some directive from the principal to the agent.  *See id.*

Apparent authority is defined as "that authority which, although not actually granted, the principal knowingly permits the agent to exercise, or holds him out as possessing." *D & G Equip. Co. v. First Nat. Bank of Greencastle, Pa.*, 764 F.2d 950, 954 (3d Cir. 1985) (citing *Revere Press, Inc. v. Blumberg*, 246 A.2d 407, 410 (Pa. 1968); *Jennings v. Pittsburgh Mercantile Co.*, 202 A.2d 51, 54 (Pa. 1964)).  Consequently, "apparent authority flows from the conduct of the principal and not from that of the agent[,]" and "can exist only to the extent that it is reasonable for the third party dealing with the agent to believe the agent is authorized." *Id.  See also Jennings*, 202 A.2d at 54 ("An agent cannot, simply by his own words, invest himself with apparent authority.  Such authority emanates from the actions of the principal and not the agent.").  "The test for determining whether an agent possesses apparent authority is whether a man of ordinary prudence, diligence and discretion would have a right to believe and would actually believe that the agent possessed the authority he purported to exercise." *In re Mushroom Transp. Co.*, 382 F.3d 325, 345 (3d Cir. 2004) (internal quotations and citation omitted).

### E.  Unjust Enrichment – Review of Applicable Law

Unjust enrichment is a quasi-contract theory of recovery which "imposes a duty, not as a result of any agreement, whether expressed or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." *Stoeckinger v.*

*Presidential Fin. Corp. of Delaware Valley*, 948 A.2d 828, 833 (Pa. Super. 2008).  In order to prove a defendant was unjustly enriched, a plaintiff must establish: "'(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.'"  *Sovereign Bank v. BJ's Wholesale Club, Inc*., 533 F.3d 162, 180 (quoting *Limbach Co. v. City of Philadelphia*, 905 A.2d 567, 575 (Pa. Commw. Ct. 2006)).

> The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff.  Instead, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for her to retain.

*EBC, Inc. v. Clark Bldg. Sys*., 618 F.3d 253, 273 (3d Cir. 2010) (cleaned up).  Further, application of the equitable doctrine depends on the facts at hand, and "it is well-settled that a plaintiff may not maintain a claim for unjust enrichment under a quasi-contract theory of recovery where the relationship between the parties is founded upon a written agreement." *Downey v. First Indem. Ins.*, 214 F. Supp.3d 414, 431, n.14 (E.D. Pa. 2016) (internal marks and citations omitted).

### F.      Section 1981 Discrimination – Review of Applicable Law

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts," and "the full and equal benefit of all laws" as that "enjoyed by white citizens[.]"  42 U.S.C. § 1981.  Section "1981's prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of

the contractual relationship, including discriminatory contract terminations." *Rivers v. Roadway Express*, *Inc.*, 511 U.S. 298, 302 (1994).

To establish a basis for relief under section 1981 a plaintiff must show "(1) that plaintiff is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute, which includes the right to make and enforce contracts[.]" *Brown v. Philip Morris, Inc*., 250 F.3d 789, 797 (3d Cir. 2001) (cleaned up) (citation omitted).  In the employment context, section 1981 "claims are subject to the same analysis as discrimination claims under Title VII of the Civil Rights Act of 1964." *Castleberry v. STI Grp*., 863 F.3d 259, 263 (3d Cir. 2017).

Title VII discrimination claims are analyzed using a three-step burden shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  First, a plaintiff must establish a prima facie case of discrimination, establishing the following: (1) plaintiff belongs to a protected class, (2) plaintiff was qualified for the position, (3) plaintiff suffered an adverse employment action, and (4) members outside the protected class were treated more favorably, or the adverse action occurred under circumstances that give rise to an inference of intentional discrimination.  *See McDonnell Douglas*, 411 U.S. at 802; *Harris v. Keystone Cement Co.,* No. 5:19-cv-01965, 2021 U.S. Dist. Lexis 32048, at *19-20 (E.D. Pa. Feb. 22, 2021).

> To allow those genuinely victimized by discrimination a fair opportunity to prevail, courts will presume that, once the plaintiff has shown the above elements, unlawful discrimination was the most likely reason for the adverse personnel action.  The elements of that prima facie case, however, must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination.

*Geraci v. Moody-Tottrup, Int'l*, 82 F.3d 578, 581 (3d Cir. 1996) (citing *McDonnell Douglas*, 411 U.S. at 802 n.13; *Torre v. Casio, Inc*., 42 F.3d 825, 830 (3d Cir. 1994) (explaining that "the

nature of the required showing to establish a prima facie case of disparate treatment by indirect

evidence depends on the circumstances of the case") (cleaned up)).

"To determine whether a statement can constitute evidence of discriminatory animus,

courts within the Third Circuit consider 'whether the speaker was a decisionmaker, the content

of the statement, and whether the statement was related to the decisional process.'" *Udasco-Kist*

*v. Thomas Jefferson Univ. Hosps., Inc*., No. 19-cv-3176, 2021 U.S. Dist. LEXIS 13685, at *18

(E.D. Pa. Jan. 25, 2021) (quoting *Kargbo v. Philadelphia Corp. for Aging*, 16 F. Supp. 3d 512,

524 (E.D. Pa. 2014)).  Evidence sufficient to survive summary judgment may include

> statements of a person involved in the decisionmaking process that
> reflect a discriminatory or retaliatory animus of the type complained
> of in the suit, even if the statements are not made at the same time
> as the adverse employment decision, and thus constitute only
> circumstantial evidence that an impermissible motive substantially
> motivated the decision.

*See Fakete v. Aetna, Inc*., 308 F.3d 335, 339 (3d Cir. 2002) (internal marks and citations

omitted).  However, "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to

the decision process are rarely given great weight, particularly if they were made temporally

remote from the date of decision."  *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509,

545 (3d Cir. 1992).  *See also Johnson v. Hershey Creamery Co*., No. 1:11-cv-00776, 2013 U.S.

Dist. LEXIS 32025, at *20-21 (M.D. Pa. Mar. 8, 2013) (holding that "no nexus" appeared

between the racial remarks and decision not to hire the plaintiff).

Second, the burden shifts to the defendant to "articulate some legitimate,

nondiscriminatory reason for the adverse action against" the plaintiff.  *Harris,* 2021 U.S. Dist.

Lexis 32048, at *20 (internal quotation and citation omitted).  "This 'relatively light' burden is

met 'if the employer provides evidence, which, if true, would permit a conclusion that it took the

adverse employment action for a non-discriminatory reason.'"  *DeCicco v. Mid-Atl. Healthcare,*

*LLC*, 275 F. Supp. 3d 546, 555 (E.D. Pa. 2017) (quoting *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013)).  For example, "[c]ourts within this district have routinely accepted evidence of a plaintiff's failure to meet expected performance goals, in addition to poor work performance, as facially legitimate, non-discriminatory reasons for adverse employment decisions."  *Id.* at 555-56 (citing *Cellucci v. RBS Citizens, N.A.*, 987 F. Supp. 2d 578, 590 (E.D. Pa. 2013); *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 387 (E.D. Pa. 2013); *Kim-Foraker v. Allstate Ins. Co.*, 834 F. Supp. 2d 267, 278 (E.D. Pa. 2011)).

Third, after a legitimate reason is proffered, the burden shifts back to the plaintiff to "establish by a preponderance of the evidence that the employer's proffered reasons were merely a 'pretext for discrimination and not the real motivation for the unfavorable job action.'"  *Jajua v. Diakon Lutheran Soc. Ministries*, 299 F. Supp. 3d 645, 652 (E.D. Pa. 2018) (quoting *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)).  "To make a showing of pretext, 'the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  *Burton.*, 707 F.3d at 427 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  "Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case."  *Fuentes*, 32 F.3d at 764 (citations omitted).  *See also Dillon v. Coles*, 746 F.2d 998, 1003 (3d Cir. 1984) ("The formula does not compartmentalize the evidence so as to limit its use to only one phase of the case.  The plaintiff's evidence might serve both to establish a prima facie case and discredit a defendant's explanation.").

## V.      ANALYSIS

### A.      GFIM's Motion for Partial Summary Judgment

In its motion for summary judgment, GFIM argues the parol evidence rule bars LVG's counterclaim for breach of contract as a matter of law, and the record evidence does not demonstrate that GFIM's actions caused LVG's alleged damages.  In response, LVG argues that the parol evidence rule is inapplicable and presents Record evidence in support of its counterclaim.

Here, the parties do not dispute that their relationship was governed by a written and enforceable contract.  Regarding parole evidence, GFIM's first argument is misplaced.  The parol evidence rule applies when "a writing is determined to be the parties' entire contract," and under the rule, "evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract."  *Yocca v. Pittsburgh Steelers Sports, Inc*., 854 A.2d 425, 436-37 (Pa. 2004) (citation omitted).  However, LVG does not attempt to enter into evidence prior oral or written agreements between the parties, only the parties' course of performance.  Because "the course of performance of the parties is always relevant in construing a contract[,]" even one that appears unambiguous, the Court may consider LVG's evidence and need not address GFIM's parol evidence argument further.  *See United States ex rel. Pioneer Constr. Co. v. Pride Enters.,* No. 3:cv-07-0994, 2009 U.S. Dist. LEXIS 110935, at *18-19 (M.D. Pa. Nov. 27, 2009) (defining "course of performance" as "a sequence of conduct between the parties subsequent to formation of the contract during performance of the terms of the contract") (internal quotations and citation omitted)).

LVG has produced evidence of the parties' course of conduct demonstrating that, when requested, GFIM would obtain additional documentation or medical notes for its samples.  Def. MSJ, Exhibit D ("Dunn Dep.") 33:15-21, 34:6-9, 35:2-4, 37:19-24, 38:1-12; Binion Dep. 109:11-18, 113:8-15, 114:18-23, 121:21-24, 122:1-4.  Although the Agreement does not specify that GFIM was required to produce medical documentation when submitting samples, a reasonable factfinder could interpret through the parties' course of performance that GFIM was required to obtain medical documentation when submitting samples to LVG.  Importantly, however, these facts are disputed, which precludes summary judgment.

Further, regarding causation, LVG has produced evidence that insurers denied multiple reimbursement claims for GFIM's samples due to missing medical records.  Jackson Dep. 177:13-23.  In the light most favorable to LVG, and assuming that GFIM was contractually required to submit medical documentation with all samples for genetic testing, a reasonable factfinder could find that GFIM caused some or all of LVG's alleged damages for failing to follow this documentation procedure.  However, there is conflicting evidence in the Record as to whether the lack of documentation submitted with GFIM's samples was caused by Binion's failure to request the documentation from medical offices, the offices failing to document or include office notes with samples as requested, or some combination thereof.  *See* Dunn Dep. 43:12-23, 44:3-18, 45:17-20, 63:11-20; Jackson Dep. 65:3-10, 66:1-10, 77:9-14, 78:18-20, 179:3-17, 180:15-17; Pl. Resp. Exhibit E ("Avery Dep.") 143:15-24.  Moreover, the Record also reflects that LVG had a screening process for samples before the lab would run tests and before reimbursement requests were submitted to payors.  Dunn Dep. 40:14-24, 41:7-11, 41:16-21, 43:12-23; Jackson Dep. 66:18-24.  Even for samples submitted with proper documentation, reimbursement by the payor was not a guarantee.  Dunn Dep. 42:10-18; Binion Dep. 63:5-11.

Therefore, alternatively, a reasonable factfinder could find that LVG was responsible for all or part of its alleged damages for running samples or submitting reimbursement requests without the appropriate documentation.  Because that determination rests on the resolution of disputed facts, this Court may not dispose of this issue at this stage of the litigation.

> **B.      LVG's Motion for Summary Judgment**

Next, LVG moves for judgment in its favor on all of GFIM's claims.  In particular,  LVG argues that (1) the parties never agreed to a bonus structure outside of the Agreement, and any promise of a bonus made by LVG's Director of Billing was not binding on LVG, (2) GFIM's unjust enrichment claim fails as a matter of law because GFIM cannot articulate a benefit conferred that was not contemplated by the Agreement, and (3) GFIM cannot establish a prima facie case of discrimination under 42 U.S.C. § 1981, or alternatively, cannot prove that LVG's proffered nondiscriminatory reasons for terminating the Agreement were pretextual.  GFIM disagrees, arguing that (1) an oral modification of the Agreement was made by LVG, and LVG is bound by the Director of Billing's oral promise, (2) the facts support an unjust enrichment theory of restitution, and (3) a prima facie case of racial discrimination is established, and the Record evidence reflects invidious discrimination in the termination of GFIM's contract.

> **1.      Breach of Contract - Oral Promise of a Bonus**

Here, it is undisputed that the Agreement, which did not contemplate a bonus structure, required any modifications to be in writing.  However, this Court finds that, in the light most favorable to GFIM, there are genuine disputes of material fact as to whether LVG waived the provision requiring modifications to be in writing and as to whether sufficiently definite terms of an oral contract establishing a bonus structure existed between the parties.

LVG does not deny that it paid GFIM $100,000 in June 2021, outside of the contracted

payment amount, and in the Managing Partner's text messages to LVG's accountant, the

Managing Partner directed the $100,000 payment to be wired to GFIM.  *See* Def. MSJ, Exhibit

K.  In its briefing, LVG refers to this payment as a "one-time payment" to settle a

"disagreement" between the parties (the dispute being GFIM's expectation of a bonus).  *See* Def.

MSJ at 11.  However, when asked by LVG's accountant what the payment was for, the

Managing Partner specifically referred to the payment as a "bonus" in their text messages,

"[u]ntil [in-house counsel] and I create the official contract."  Harris Dep. 13:9-16; Def. MSJ,

Exhibit K.

GFIM contends that the $100,000 payment was a partial payment of the promised bonus

of $325,000.  To support this, the Director of Billing, has notes from her conversations with

Binion which suggest that a bonus at or around this figure was specifically discussed, as well as

business targets for GFIM to reach in order to receive the bonus. Avery Dep. Exhibits.  In his

testimony, LVG's accountant confirmed that he was directed to send this payment by the

Managing Partner and, he was limited from electronically wiring more than $100,000 per day.

Harris Dep. 3:9-16, 17:25, 18:2.  A reasonable factfinder could conclude that the payment was

only a partial bonus payment, due to the accountant's daily wiring cap or some other reason, or

that it was not a bonus at all and only intended to resolve a dispute.  Nevertheless, "clear, precise,

and convincing" record evidence exists, particularly this payment when viewed in the context of

the Managing Director's text messages to LVG's accountant and the conversations between

Binion and the Director of Billing, which could persuade a reasonable factfinder that the

Managing Partner had waived the requirement that modifications to the contract be made in

writing and had orally agreed to the bonus structure discussed by the Director of Billing and

Binion.  *See Somerset Cmty. Hosp. v. Allan B. Mitchell & Assocs*., 685 A.2d 141, 146 (Pa. Super. 1996) (holding that the parties orally modified their agreement where the record clearly and convincingly "evidence[d] a multitude of minutes from meetings wherein representatives of both parties extensively discussed that DRS would continue to perform additional services, and that DRS would be compensated for such additional work").  *See also Fina v. Fina*, 737 A.2d 760, 765 (Pa. Super. 1999) (finding clear and convincing evidence of oral modification in the context of a child support agreement where appellant "express[ly] agree[d] to accept reduced support" and "fail[ed] to enforce the original provision," and appellee "compl[ied] with appellant's request to restore the original support amount").

### a.     The Director of Billing's authority

GFIM asserts that the Director of Billing had either express, implied, or apparent authority to enter into a bonus structure agreement on LVG's behalf.  LVG asserts that the Director of Billing had no contracting authority and therefore any promise of a bonus allegedly made by the Director of Billing was not binding on LVG.  However, disputed material facts exist wherein a reasonable factfinder could find that the Director of Billing acted as an agent of LVG when negotiating and contracting with GFIM regarding a bonus structure.

With regard to express or implied authority, the Director of Billing testified that the Managing Partner expressly directed her to discuss the alleged bonus structure with Binion. Avery Dep. 134:12-24, 135:11-14; 138:18-24.  But, the Managing Partner denies giving any such directive.  Both the Managing Partner and LVG's in-house counsel deny that the Director of Billing had any express authority to contract on behalf of LVG.  Jackson Dep. 140:17-22; Dunn Dep. at Ex. P-74.

With regard to apparent authority, even if the Director of Billing was never specifically directed to enter into a bonus agreement, a reasonable factfinder could conclude that she did so with the Managing Partner's awareness.  Significantly, the Director of Billing appears from the record to be the only representative of LVG to negotiate the terms of the original Agreement with GFIM.  The Managing Partner testified that she relied upon the Director of Billing and LVG's in-house counsel to negotiate the terms of the Agreement.  Jackson Dep. 34:1-4.  However, in-house counsel testified that he was not involved in the negotiation of the Agreement's terms, and instead merely drafted the written document after being provided with its terms, by either the Managing Partner or the Director of Billing in an email.  Dunn Dep. 23:3-17, 134:21-25, 135:2-6, 156:3-8.  Thus, the Director of Billing was possibly the only representative of GFIM that conducted contractual negotiations on LVG's behalf when contracting with GFIM, though she acknowledged having never signed a contract on LVG's behalf.  *See* Avery Dep. 89:20-90:7.  Although LVG places great weight on the Director of Billing's knowledge, arguing that she knew she did not have contracting authority due to having never signed a contract on LVG's behalf, the agent's beliefs about her authority are not pertinent to this analysis—only the principal's actions.  *See Jennings*, 414 Pa. at 645, 202 A.2d at 54 ("An agent cannot, simply by his own words, invest himself with apparent authority.  Such authority emanates from the actions of the principal and not the agent.").  Therefore, a reasonable factfinder could find that it was not unreasonable for Binion to believe that the Director of Billing was authorized to contract on behalf of LVG, based on their prior similar interactions.

In sum, in the light most favorable to GFIM, a reasonable factfinder could find that the Managing Partner held the Director of Billing out as someone with contracting authority by permitting her to handle contract negotiations, which could lead an ordinarily prudent

businessman in Binion's position to believe that the Director of Billing possessed the authority to contract on LVG's behalf.  A reasonable factfinder could also conclude that the Director of Billing, acting as an agent of LVG, entered into a bonus structure agreement with Binion which orally modified the Agreement.  Because the determination rests on the resolution of disputed material facts, summary judgment is denied.

### 2. Unjust Enrichment

Both parties acknowledge that their relationship was governed by a written contract, and GFIM does not allege performing any services that were not already contemplated by the existing Agreement.  Consequently, because the services performed by GFIM, whether adequately paid for or not, were governed by the Agreement, GFIM has not articulated a benefit conferred that would support a quasi-contract theory of recovery.  The equitable doctrine of unjust enrichment is therefore inapplicable as a matter of law, and judgment is entered in LVG's favor and against GFIM on this count.

### 3. Section 1981 Discrimination

Under the *McDonnell Douglas* framework, GFIM has cast sufficient doubt on LVG's proffered nondiscriminatory reason for termination, such that summary judgment is inappropriate.

First, GFIM has established a prima facie case of discrimination or at least created a genuine dispute of material fact: (1) GFIM belongs to a protected class as a racial minority;[2] (2)

---

[2]     Although not argued by either party, the Court notes briefly that GFIM is recognized as a member of a protected class because the entity is solely owned and operated by Binion, GFIM's Black president.  *See Howard Sec. Servs., Inc. v. Johns Hopkins Hosp.*, 516 F. Supp. 508, 513 (D. Md. 1981) (holding that the plaintiff, a close corporation wholly owned and operated by its president, a Black man, had a cause of action under section 1981 because "[t]o deal with [Plaintiff] is, practically speaking, to deal with [its president]").

GFIM was qualified for the position as its owner, Binion, was a sales rep with years of experience in marketing laboratory testing; *see* Jackson Dep. 104:23; Dunn Dep. 35:2-4; Binion Dep. 63:14-16; and (3) GFIM suffered an adverse employment action when LVG terminated the Agreement.  LVG concedes that GFIM can establish the first three elements of a prima facie case, but argues that GFIM cannot prove the fourth element, that members outside the protected class were treated more favorably, or that the adverse action occurred under circumstances that give rise to an inference of intentional discrimination.

This Court finds that GFIM has adequately shown circumstances from which a factfinder could infer intentional discrimination based on testimony offered by Dr. Jasen Chi, a business acquaintance of Binion's.  Dr Chi testified that he spoke with the Managing Partner on at least two occasions, and with in-house counsel on one occasion, in the fall of 2021 when considering a partnership between his medical practice and LVG.  Pl. Resp., Exhibit F ("Chi Dep.") 11:21-22. According to Dr. Chi, during "more than one" conversation with the Managing Partner she referred to Binion as the "n-word" and a "stupid Black man," and in at least one of those conversations, the Managing Partner also stated that LVG was planning on terminating GFIM's contract "because [Binion] was paid too much."  Chi Dep. 12:18-19, 14:18-23, 16:12-16; 17:2-7. These conversations took place sometime between mid-September to early October 2021.  *See* Chi Dep. 54:2-13.  During a phone conversation between in-house counsel and Dr. Chi on or around October 9, 2021, in-house counsel also referred to Binion as the "n-word" and mentioned that GFIM's contract would be terminated.  Chi Dep. 17:2-7, 47:4-22, 60:3-14.  The last of these conversations took place about a month before Binion was notified of GFIM's termination.

Second, LVG has articulated a legitimate, nondiscriminatory reason for terminating GFIM's contract, which also forms the basis of LVG's counterclaim for breach of contract.  As

previously discussed, LVG alleges that GFIM failed to follow the company's practices and procedures with regard to the appropriate medical documentation required for the submission of samples. Jackson Dep. 60:21-25, 61:1-6.

Third, based on Dr. Chi's testimony regarding his conversations with LVG's Managing Partner and in-house counsel, a reasonable factfinder could conclude that an invidious discriminatory reason was more likely than not a motivating cause of LVG's decision to terminate its relationship with GFIM.  As explained above, the Managing Partner and in-house counsel both referred to Binion as the "n-word" or a "stupid Black man" in conversations with Dr. Chi where they also mentioned that GFIM's contract would be terminated.  A few weeks later, GFIM received notice that the Agreement was terminated.  LVG acknowledges that the Managing Partner made the decision to terminate the Agreement.  Jackson 60:14-20; Dunn 72:2-20.  This Court finds that, in the light most favorable to GFIM, these "statements of a person involved in the decisionmaking process[,]" particularly the Managing Partner,[3] "reflect a discriminatory or retaliatory animus of the type complained of in the suit[.]"  *See Fakete*, 308 F.3d at 339.  Though the statements were not made directly to Binion or at the same time as the adverse employment decision, and therefore "constitute only circumstantial evidence that an impermissible motive substantially motivated the decision[,]" this Court nevertheless finds that this evidence is sufficient for GFIM's claim to survive summary judgment.  *See Fakete*, 308 F.3d at 339.  The Managing Partner's statements were not merely "stray remarks . . . unrelated to the decision process[.]"  *See Ezold*, 983 F.2d at 545.  Rather, the discriminatory comments made

---

[3]     Although at this stage the Court places more weight on the Managing Partner's statements due to her role as the decisionmaker, a reasonable factfinder could also attribute weight to in-house counsel's statements, who admittedly recommended termination of GFIM's contract, appeared to play a substantial role in the termination process, and whose statements were temporally close to the termination.  *See* Dunn Dep. 72:2-20.

were specifically about Binion and occurred during the same conversation where the Managing

Partner revealed that LVG was planning to terminate GFIM, suggesting a nexus between the

racial remarks and the decision to terminate the Agreement.  The temporal proximity of these

conversations to the date GFIM was notified of its termination similarly suggest a nexus and may

give rise to an inference of invidious discrimination.

In its motion, LVG refutes the facts at hand, claiming that the Managing Partner never

made the alleged comments to Dr. Chi and that the conversation between Dr. Chi and in-house

counsel never took place.  Because this claim requires the resolution of disputed facts, summary

judgment is inappropriate.

Accordingly, LVG's motion for summary judgment is granted in part, pursuant to

GFIM's unjust enrichment claim, and denied in part regarding GFIM's discrimination and

breach of contract claims, and GFIM's remaining claims against LVG may proceed to trial.

## VI.    CONCLUSION

Following a review of GFIM's motion for partial summary judgment, the motion is

denied.  Genuine disputes of material fact preclude this Court from deciding whether GFIM's

actions or inactions violated the Agreement and caused LVG's alleged damages.

After a review of LVG's motion for summary judgment, the motion is granted in part and

denied in part.  As a matter of law, GFIM cannot proceed on an unjust enrichment theory of

restitution.  However, genuine disputes of material fact preclude this Court from deciding

whether LVG orally modified the Agreement to include a bonus structure, and whether LVG

racially discriminated against GFIM in its termination of the Agreement.  Rather, these decisions

are best left to the factfinder and may proceed to trial.

A separate Order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*_____
JOSEPH F. LEESON, JR.
United States District Judge