**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GF INDUSTRIES OF MISSOURI, LLC | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  22-227 |
| | : | |
| LEHIGH VALLEY GENOMICS, LLC | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                                                    **April 30, 2024**

I.      <u>**Introduction**</u>

This case is about a contractual relationship between a diagnostic laboratory and its consultant that went sour.  GF Industries of Missouri, LLC (GFIM) claims that Lehigh Valley Genomics, LLC (LVG) orally modified a written agreement to include bonus payments.  GFIM further alleges that not only did LVG fail to pay that bonus, but LVG also terminated the contract because of GFIM's owner's race.  LVG denies both the existence of the bonus agreement and that racial discrimination played any role in the contract termination.  LVG also introduced a new argument on the third day of trial, suggesting that the agreement is invalid because it calls for illegal kickbacks.

We held a five-day bench trial and heard from witnesses on both sides, and then received extensive post-trial briefing.  As explained below, after weighing all the evidence, we find that that LVG promised GFIM a bonus and then breached this modified contract by failing to pay the bonus.  We also find that LVG failed to demonstrate that the contract was void.  Finally, we find LVG's termination of the parties' contract was not motivated by racial discrimination.

II.     __Procedural History__

Plaintiff GFIM filed a complaint against LVG alleging breach of contract, unjust enrichment, and a violation of 42 U.S.C. § 1981.  DI 1.  Judge Leeson entered summary judgment in LVG's favor on the unjust enrichment count.  DI 40; DI 41.  The case was transferred to us, and we proceeded to trial on the breach-of-contract claim and the racial discrimination claim under § 1981.  DI 46.

Post-trial briefing concluded on June 30, 2023.  DI 73.  LVG then filed a motion for leave to file a sur-reply, which we granted.  DI 74, DI 75.  GFIM filed a motion for leave to file a sur-sur-reply on July 26, 2023, and LVG responded to this motion.  DI 77, DI 78.  We granted GFIM's motion to file a sur-sur-reply on March 15, 2024.  DI 80.

GFIM's claims are ripe for disposition.  For the reasons stated below, we will grant judgment in favor of GFIM on its breach of contract claim and against GFIM on its 42 U.S.C. § 1981 claim.

III.    __Findings of Fact__[1]

    A.     __The parties__

        1.  GF Industries of Missouri ("GFIM") is an LLC that provides marketing, management, informational, and support services to companies and healthcare providers related to genetic and molecular laboratory testing.  JX 5 at 1.

        2.  Lee Binion is the sole owner and president of GFIM.  DI 61 at 6; DI 50 at 2.

        3.  Mr. Binion is African American.  DI 50 at 2.

        4.  Mr. Binion began his medical sales career in 2005 and has worked in several roles in this field.  DI 61 at 7-11.

        5.  Lehigh Valley Genomics ("LVG") is a clinical laboratory that offers molecular and genetic testing services to healthcare providers.  JX 5 at 1; DI 50 at 2.

---

[1] The citations in this section are merely exemplary.  We considered the entire record when rendering each finding of fact, and we weighed the credibility of the witnesses as well.

6. Lisa Jackson is the co-owner of LVG with Dr. Anil Deshpande.  DI 62 at 212, 224; DI 50 at 2.

7. Robert Dunn is LVG's general counsel.  DI 64 at 117-18.

8. Karen Avery was the Director of Billing at LVG starting in 2020 until her employment was terminated in 2022.  DI 62 at 53-55.

9. Prior to working at LVG, Ms. Avery worked in billing and medical office management during her career, which began in 1982.  DI 62 at 51-53.

10. Ms. Avery's duties at LVG included billing, recoupments, audits, credentialing, taking patient and physician complaints, and working with the sales team.  Her work with the sales team included interviewing and hiring a couple of members on the sales team, as well as checking in with them about the samples they were procuring.  DI 62 at 54-55.

B.    The original contract

1. Ms. Jackson instructed Ms. Avery to call Mr. Binion to set up his original contract with LVG.  DI 62 at 66.

2. Ms. Avery had a conversation with Mr. Binion about working with LVG at the behest of Ms. Jackson.  DI 62 at 70-71.

3. Mr. Binion did not negotiate his initial contract with anyone besides Ms. Avery.  DI 61 at 10-13; DI 62 at 75-76.

4. Ms. Jackson told Ms. Avery to offer a contract to Mr. Binion.  DI 62 at 74.

5. On May 1, 2021, GFIM and LVG entered into a written "Development and Marketing Services Agreement."  JX 5 at 1; DI 50 at 2.

6. The written agreement was signed by Ms. Jackson and Mr. Binion.  JX 5 at 11; DI 50 at 2.

7. The written agreement describes GFIM as "engaged in the business and practice of developing programs to market the services of various companies and service providers in the healthcare industry within the United States and employs administrative and account management personnel familiar with genetic and molecular laboratory testing who can provide informational and support services for healthcare providers."  JX 5 at 1.

8. The written agreement describes LVG as "in need of certain development and marketing services."  JX 5 at 1.

9. The written agreement states that GFIM will provide development and marketing services to LVG.  JX 5 at 1.

10. These services include sales and growth, education and product training, distribution management services, account management, and quality initiatives.  JX 5 at Ex. A.

3

11. In particular, Mr. Binion's services were hoped to increase the number of samples from healthcare providers that LVG would analyze in its laboratory. DI 62 at 38-41.

12. The overall number of samples anticipated from healthcare providers associated with contractors, like Mr. Binion, is a factor in setting the contractors' compensation.  DI 64 at 105.

13. The written agreement states that there will be a three-month "startup period" during which GFIM would be paid $100,000 per month.  JX 5 at 3.

14. After this "startup period," the written agreement states that the parties would "confer regarding the amount of compensation to continue to be paid by LVG to [GFIM] for the remainder of the Term."  JX 5 at 3.

15. If compensation changed after the "startup period," the written agreement states that parties would "enter into a written amendment, signed by both parties, reflecting the adjusted amount of such compensation."  JX 5 at 3.

16. The term of the written agreement was one year unless it was terminated pursuant to Section 7 of the agreement.  JX 5 at 3.

17. Section 7 of the written agreement provides the parties' rights concerning termination and states that "either party may terminate this Agreement for any reason by providing 15 days' advance written notice."  JX 5 at 6.

18. The written agreement has a provision titled "Entire Agreement" that states "[t]his Agreement supersedes any and all prior agreements, either oral or written, between the parties with respect to the subject matter of this Agreement (including any term sheet or similar agreement or document relating to the transactions contemplated hereby).  This Agreement constitutes the entire agreement between parties with respect to the subject matter hereof, and no party shall be entitled to benefits other than those specified herein." JX 5 at 8-9.

19. The written agreement has a provision titled "Amendment" that states "[t]his Agreement may be modified or amended only by a written instrument duly executed by each of the parties hereto."  JX 5 at 9.

C.   LVG promises GFIM a bonus

1. Once entering the contract, Mr. Binion was in almost daily contact with Ms. Avery to discuss a number of things, including reviewing samples received and new accounts that they were onboarding.  DI 61 at 13-14.

2. At the beginning of Mr. Binion's contract, Ms. Jackson and Ms. Avery were impressed by the number of samples he was procuring.  DI 62 at 83-84.

3. On May 28, 2021, Ms. Avery texted Ms. Jackson that Mr. Binion "signed another account today."  Ms. Jackson responded, "Are you serious," and Ms. Avery sent back, "[y]es he is a beast."  DI 62 at 83-84; PX 50.

4

4. As a result of his performance, Ms. Jackson, Ms. Avery, and Mr. Sood[2] had several Teams calls to discuss offering Mr. Binion a bonus. DI 62 at 80.

5. The bonus structure was reduced to writing in the form of a set of typed tables. DI 62 at 77-78; DI 61 17-19; PX 49; PX 17.[3]

6. The bonus structure was based on the number of samples produced, the type of test, and the type of insurance associated with the sample. DI 61 at 18-19; PX 17.

7. The bonus structure includes five different types of tests. They are indicated by codes, which are CGX,[4] CDM, DOW, ADP, and PGX. PX 17; DI 62 at 221-22.

8. For each type of test, the bonus structure provides for different amounts GFIM would earn based on the type of insurance or "payor" associated with that sample. PX 17; DI 61 at 19.

9. The bonus structure provides for a bonus only if Mr. Binion produced in excess of 70 samples per month.[5] PX 17; DI 61 at 18, 24. For each sample Mr. Binion produced in excess of the agreed amount, the bonus structure provides that GFIM would receive a bonus based on the type of test and insurance associated with that sample, as described above. PX 17; DI 62 at 155-56.

10. The bonus structure did not alter the services GFIM was expected to perform. Rather, it changed the compensation structure. PX 17

11. Ms. Jackson devised, or at least approved, the bonus structure. DI 62 at 78-79.

12. Mr. Binion attended one of the Teams calls where Ms. Jackson — or possibly Ms. Avery and Mr. Sood in the presence of Ms. Jackson — presented the bonus structure to him.[6] DI 62 at 78-79; DI 61 at 17-19.

---

[2] Mr. Deepak Sood did billing work for LVG. Mr. Sood was in India and still working as a consultant for LVG at the time of the trial. DI 64 at 50, 98-99.

[3] It is of limited materiality, but we believe Mr. Sood likely created the document because Mr. Binion refers to PX17 as "Deepak's document." DI 62 at 28-29.

[4] For example, CGX stands for cancer genetic testing. This type of test shows if a person carries a gene that puts them at risk for a certain cancer. DI 62 at 221.

[5] This was further broken down by test, so that GFIM would receive the bonus if Mr. Binion produced in excess of 20 CGX samples, 20 CDM samples, 10 DOW/ADP samples, and 20 PGX samples. PX 17; DI 62 at 192-93, 155-56.

13. The Teams call that Mr. Binion attended included Ms. Jackson, Ms. Avery, and Mr. Sood.  DI 62 at 78-79.

14. To the extent that Ms. Avery presented portions of the bonus structure, Ms. Avery had express authority from Ms. Jackson to do so.  DI 62 at 78-79.

15. Mr. Binion accepted the bonus agreement.  DI 62 at 79; DI 61 at 19.[7]

16. Ms. Avery sent herself an e-mail with the bonus structure in early June of 2021.  DI 62 at 77-78; PX 49.

17. Ms. Avery memorialized the discussions about the bonus in her handwritten notes, which include the word "bonus."  DI 62 at 79-81; PX 49.

18. After accepting LVG's offer, Mr. Binion "marketed way harder" in accordance with the bonus structure.  DI 61 at 19-20; DI 70 at 63-64; PX 58.

19. When Mr. Binion's bonus did not arrive, he sent a message to Ms. Avery noting he received "only the contractual amount."  DI 62 at 89-91, PX 55.

20. Ms. Avery forwarded that text to Ms. Jackson on June 17, 2021.  DI 62 at 89-91, PX 55.

21. The following day, on June 18, 2021, Ms. Jackson instructed her accountant to pay GFIM $100,000.  DI 70 at 40-41; PX 107 at 6-7, 12-13; PX 59.[8]

22. In response to a question about the payment from her accountant, Ms. Jackson responded in a text message "[y]es this is a bonus."  DI 70 at 41; PX 107 at 13.

23. She also says this payment is "[u]ntil Rob and I create the official contract." PX 107 at 13.

24. Ms. Jackson explained to Mr. Binion that the $100,000 was part of the bonus and that she would pay the rest later.  DI 61 at 36-37.

25. Ms. Jackson also told Ms. Avery the $100,000 was part of the bonus payment. DI 62 at 87, 96.

26. On July 8, 2021, Mr. Binion sent a text message to Ms. Jackson that said "never got additional from Charlie just regular."  DI 61 at 38-41; PX 19.

---

[6] It turns out to be immaterial exactly who devised the bonus structure and who took the lead presenting it on the call because it was clear, and we so find, that Ms. Jackson was entirely involved and approving of the proposal.

[7] Discussions about the bonus generally and the parties' eventual agreement took place around late May and early June of 2021.  DI 62 at 27.

[8] It appears that PX 59 was not made part of the record, but we cite it here for general reference.  The factfinding is supported adequately by, *inter alia*, the other citations noted.

27. When Mr. Binion referenced "additional" in the July 8, 2021 text message, he was referring to the bonus.  DI 61 at 40-41.

28. When Mr. Binion referenced "Charlie" in the July 8, 2021 text message, he was referring to Charles Harris, LVG's accountant.  DI 61 at 41.

29. In response, Ms. Jackson did not indicate that Mr. Binion was not entitled to "additional" compensation, nor did she express confusion about what Mr. Binion meant by "additional."  DI 61 at 38-45; PX 19.

30. Rather, Ms. Jackson responded, "[w]hat time are you available to talk tomorrow to Rob and I."  PX 19.

31. On July 14, 2021, Mr. Binion sent another message to Ms. Jackson that said "Charlie for tomorrow?"  DI 61 at 43; PX 18.

32. When Mr. Binion sent the July 14, 2021 message, he was referring to LVG's accountant Charles Harris, and he wanted to speak to Mr. Harris about GFIM's bonus.  DI 61 at 43.

33. In response, Ms. Jackson did not ask why Mr. Binion wanted to speak to Mr. Harris. Rather, she responded "[y]es Charlie."  PX 18.

34. Mr. Binion told Mr. Dunn about the bonus agreement in a telephone call on July 30, 2021.  DI 64 at 185-86.

35. After learning about the bonus agreement, Mr. Dunn sent an e-mail to Mr. Binion on August 1, 2021, which communicated that LVG did not intend to make any further bonus payments to Mr. Binion.  PX 21.

36. In response to Mr. Dunn's August 1, 2021 e-mail, Mr. Binion responded to Mr. Dunn on August 2, 2021 with an e-mail that said "Lisa did not tell me that was a one-time deal either.[ ]The discussion was let's see where she ends up revenue wise and we will revisit."  PX 21.

37. Mr. Binion also noted in the August 2, 2021 e-mail to Mr. Dunn that the amount "fell way short of what Karen told me and re promised me after the samples came in."  PX 21.

38. We therefore find that LVG orally modified its original written contract by offering GFIM a bonus.

39. LVG then breached this contract by failing to pay GFIM the promised bonus.

40. LVG owed GFIM a $478,750 bonus.  DI 61 at 22-31; PX 58; PX 29.[9]

---

[9] This number is derived from Mr. Binion's calculations.  In order to calculate his bonus payment, Mr. Binion relied primarily on a January 20, 2022 e-mail that contains information about the number of samples he produced and the document shown during the Teams call that outlined his bonus structure.  DI 61 at 22-31; PX 58; PX 17; PX 29.  We note that PX 29, which

41. LVG already paid $100,000 of the bonus to GFIM.  DI 70 at 40-41; DI 61 at 36-37; PX 107 at 12-13; PX 59.

42. Thus, GFIM is entitled to $378,750 in damages.

D. <u>GFIM's contract termination</u>

1. On November 4, 2021, LVG provided a 15-day notice of termination to GFIM. DI 50 at 2; DI 64 at 204-05; DX 150.

2. The agreement was terminated on November 19, 2021.  DI 50 at 2; DI 64 at 204-05; DX 150.

3. LVG terminated GFIM's contract for more than one reason.  These reasons include the following:

  a. Ms. Jackson and Mr. Dunn feared the bonus structure may violate the Eliminating Kickbacks in Recovery Act (EKRA) and therefore posed a compliance risk.  DI 64 at 106-07, 159-160; PX 21.

    i. Ms. Jackson discussed EKRA at LVG and was concerned about how it affected her ability to pay independent contractors.  DI 64 at 104-05.

---

is in essence a demonstrative, is generally supported by the record, but contains a number of inconsistencies that could have easily been highlighted by LVG.  For instance, Mr. Binion appears to have incorrectly copied over certain numbers from the January 20, 2022 e-mail.  PX 29 at 1.  He apparently did not correctly add the number of samples on which his bonus depends. PX 29 at 2.  He apparently did not include information about the type of insurance associated with each individual sample.  *Id.*  Furthermore, he appears to have added $36,000 in a bonus payment from samples associated with Missouri Healthnet, which are not found in the chart of samples labeled "[m]onth wise received sample type summary" in the January 20, 2022 e-mail. PX 29 at 4-5; DI 61 at 24-25.  These observations involve a degree of educated speculation, but LVG — through argument or briefing — did not put us in a position to reach any conclusion other than that proposed by GFIM.

Apart from generally noting in its sur-reply that GFIM relies on its own calculations and that this "does not pass muster to warrant relief," LVG does not challenge GFIM's damages calculation.  DI 76 at 7.  Importantly, LVG offers no alternative amount for the bonus payment — apart from asserting there should be no bonus payment at all.  DI 72; DI 76.  Nor does LVG challenge any specific aspects of Mr. Binion's bonus calculation.  *Id.*  This is not a critique of LVG's strategy here — we may be wrong about the calculations or perhaps whatever errors there may have been in the calculation were not worth disputing.  But in any event, we accept that Mr. Binion earned a bonus of $478,750.

      ii.  Mr. Dunn said it was "almost terrifying" when he learned of the bonus agreement and that he feared it posed a significant risk for LVG, Ms. Jackson, and himself.  DI 64 at 159-60, 188.

      iii.  Mr. Dunn told Mr. Binion that the bonus agreement was non-complaint in the August 1, 2021 e-mail that he sent to Mr. Binion. PX 21.

  b.  Mr. Binion used his Gmail account for work-related communication instead of a HIPAA-compliant e-mail account.  DI 64 at 78-79; PX 18.

  c.  Mr. Binion did not always provide proper documentation with his samples.  DI 62 at 143-147; DI 64 at 169; DX 154; DX 155; DX 157; JX 7 ¶ 3.

      i.  Payors require documentation that the test was medically necessary before providing reimbursement.  DI 61 at 63-64.

      ii.  Mr. Binion had to be reminded on multiple occasions to provide proper documentation.  DX 155; DX 157; JX 7 ¶ 3.

  d.  Mr. Binion struggled to use LVG's portal to order supplies.  DI 64 at 169-73; PX 16.

  e.  Mr. Binion's performance declined.  DI 64 at 170, 201-02; PX 58.

      i.  In May, Mr. Binion procured 168 samples.  PX 58.

      ii.  In June, Mr. Binion procured 281 samples.  PX 58.

      iii.  In July, Mr. Binion procured 91 samples.  PX 58.

      iv.  In August, Mr. Binion procured 76 samples.  PX 58.

      v.  In September, Mr. Binion procured 89 samples.  PX 58.

      vi.  In October, Mr. Binion procured 71 samples.  PX 58.

4.  Mr. Dunn and Ms. Jackson did not make racially derogatory comments about Mr. Binion, as alleged in Dr. Chi's[10] deposition testimony.  PX 108 at 12, 47.

5.  Telephone records show that Mr. Dunn received no calls from Dr. Chi, even though Dr. Chi said racially derogatory statements were made to him during a phone call between him and Mr. Dunn.  PX 108 at 45-47; DI 64 at 218-222; DX 117; DX 120; DX 121.

6.  Ms. Jackson said something to Mr. Binion along the lines of "I'm surprised, you speak very well."  DI 61 at 59, 130-31.

---

[10] Mr. Binion introduced Dr. Jasen Chi to Ms. Jackson, and they had discussions about Ms. Jackson helping Dr. Chi build a lab that would send LVG samples.  DI 70 at 78-79.

7.  This was one, isolated comment and Mr. Binion did not see fit to respond.  DI 61 at 130-31.

8.  Jason Bennett, another independent contractor who worked with LVG, said Mr. Dunn told him he was severing ties with Mr. Binion because Mr. Dunn wanted to work more with "the new guys."  PX 109 at 17-20.

9.  In a sworn statement on June 27, 2022, Mr. Bennett said that he "in no way understood Mr. Dunn's comment to be referring to race, ethnicity or any other demographic characteristic."  JX 4 ¶ 4.[11]

10. Ms. Avery testified that Ms. Jackson called Sylvester Williams, the owner of a different lab, a "big black guy" and said he "shouldn't own a lab."  DI 62 at 123.

11. On redirect, Ms. Avery gave a different description of what Ms. Jackson said, adding that Ms. Jackson called Mr. Williams "dumb."  DI 62 at 201.

12. Ms. Avery also testified that the timing of the relationship with Mr. Williams was "difficult to remember."  DI 62 at 173.

13. LVG's relationship with Mr. Williams continued without incident after Ms. Avery said Ms. Jackson made this comment.  DI 62 at 173-76.

14. Ms. Jackson said the Indian staff "live like pigs" and that certain Hispanic staff would not "be a good fit" for LVG.  DI 62 at 124-125.

15. Ms. Jackson did not make these statements in a conversation related to Mr. Binion or GFIM's contract termination.  DI 62 at 124-125.

16. Spirit Healthcare, Inc. is owned by a Caucasian man.  DI 70 at 86.

17. LVG contracted with Spirit after terminating GFIM's contract in October of 2021. DI 70 at 84.

18. LVG decided to re-engage with Spirit because it saw an opportunity to bring in samples from a relationship with a pharmaceutical company.  DI 70 at 84-86.

19. Spirit's contact with LVG was terminated prior to its contractual end date.  DI 70 at 86.

20. LVG did not terminate GFIM's contract because of Mr. Binion's race.

---

[11] Mr. Bennett gave an earlier unsworn statement on May 26, 2022.  PX 95.  While Mr. Bennett's version of events remains largely consistent, to the extent they could be construed differently, we find credible the information he provided in his subsequent sworn statement and deposition.  PX 109; JX 4.

**IV.**    <u>**Conclusions of Law**</u>

GFIM asserts claims against LVG for breach of contract and for racial discrimination in violation of 42 U.S.C. § 1981.  DI 71.  GFIM claims that LVG promised a bonus it failed to provide and that LVG terminated GFIM's contract because Mr. Binion, the sole owner of GFIM, is African American.  DI 71.

LVG makes a number of arguments in response.  First, LVG argues the parties' original written contract controls and no oral modification was made to provide Mr. Binion with a bonus. DI 72 at 16-23.  As part of this argument, LVG asserts that Ms. Avery had no authority to offer Mr. Binion a bonus.  DI 72 at 18-19.  LVG further argues that the contract is potentially unenforceable because it may violate the Eliminating Kickbacks in Recovery Act ("EKRA").  DI 72 at 21-23.  Second, LVG argues that it did not violate 42 U.S.C. § 1981 because GFIM's contract termination was not racially motivated.  DI 72 at 23-31.

We have considered both parties' evidence and legal arguments.  We find that LVG orally modified its original written contract by offering GFIM a bonus and then breached this modified contract by failing to pay GFIM the promised bonus.  We also find that Ms. Avery had express authority from Ms. Jackson to offer this bonus.  We further find that this contract is not void for illegality under EKRA.  Finally, we find that GFIM's contract was not terminated because of racial discrimination in violation of 42 U.S.C. § 1981.  Rather, we find GFIM's contract was terminated for legitimate, non-discriminatory reasons, including Mr. Binion's performance and LVG's fears that the bonus structure presented a compliance risk.

We will therefore enter judgement for GFIM on its breach-of-contract claim and against GFIM on its 42 U.S.C. § 1981 claim.

**a. LVG orally modified the written contract by promising GFIM a bonus.**

Under Pennsylvania law,[12] a breach-of-contract claim requires "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Ware v. Rodale Press, Inc*., 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Written contracts may be modified orally, but only if the modification is "of such specificity and directness as to leave no doubt of the intention of the parties to change what they had previously solemnized by a formal document." *Gloeckner v. Sch. Dist. of Baldwin Twp*., 175 A.2d 73, 75 (Pa. 1961). Evidence of oral modification should be so persuasive that it is "like an ink eradicator across the written paper, leaving it blank so that the parties in effect start afresh in their negotiations and mutual commitments." *Id.*

Parties may orally modify a written contract even when they previously agreed that any further modifications would be made in writing. *MDNet, Inc. v. Pharmacia Corp*., 147 F. App'x 239, 243 (3d Cir. 2005). This requires proof by "clear, precise and convincing evidence, including conduct by the parties that 'clearly shows the intent to waive the requirement that the amendments be made in writing.'" *Id.* (quoting *Somerset Cmty. Hosp. v. Allan B. Mitchell & Assocs., Inc.,* 685 A.2d 141, 146 (Pa. Super. Ct. 1996)); *see Hampden Real Est., Inc. v. Metro. Mgmt. Grp., Inc*., 142 F. App'x 600, 603 (3d Cir. 2005) (finding an affidavit from a company's president, coupled with a settlement statement reviewed by parties that omitted an escrow account credit, created a genuine issue of material fact about whether parties intended to orally modify a prior written agreement to exclude the credit); *Somerset Cmty. Hosp.*, 685 A.2d at 146 (holding that a "multitude of minutes" from meetings with representatives of both parties

---

[12] Both parties apply Pennsylvania law to this dispute. *See* DI 71 at 28 (ECF); DI 72 at 18.

indicating a company should continue working and would be compensated for additional work helped constitute "clear and convincing evidence" of oral contract modification); *Fina v. Fina*, 737 A.2d 760, 765 (Pa. Super. Ct. 1999) (finding evidence of an oral contract modification to reduce child support payments when the party that claimed it was receiving lower child support payments did not take steps to enforce the original agreement).

Here, there is "clear, precise and convincing evidence" of an oral contract modification, including conduct that "clearly shows the intent to waive the requirement that the amendments be made in writing." *MDNet*, 147 F. App'x at 243.  Impressed with Mr. Binion's performance, Ms. Jackson, Ms. Avery, and Mr. Sood had several Teams calls to discuss offering Mr. Binion a bonus.  FF[13] ¶¶ (C)(2-4).  Mr. Sood[14] reduced the bonus structure to writing in the form of a set of typed tables.  FF ¶¶ (C)(5-9).  Mr. Binion attended one of the Teams calls, where Ms. Jackson, or possibly Ms. Avery and Mr. Sood with Ms. Jackson's approval, presented the bonus structure to Mr. Binion, and then he accepted it.  FF ¶¶ (C)(11-15).  Discussions about the bonus were memorialized in Ms. Avery's handwritten notes, which include the word "bonus."  FF ¶ (C)17.  After accepting LVG's offer, Mr. Binion "marketed way harder" in accordance with the bonus structure.  FF ¶ (C)18.

Most tellingly, when Mr. Binion complained that his bonus did not arrive, Ms. Jackson instructed her accountant to pay GFIM an additional $100,000 and described the money as a "bonus" in the same text conversation with her accountant.  FF ¶¶ (C)(19-22).  She also said the money was "[u]ntil Rob and I create the official contract."  FF ¶ (C)(23).[15]  Further, Ms. Jackson

---

[13] We refer to our above findings of fact as "FF."

[14] We believe Mr. Sood likely created this document.  FF ¶ (C)(5).

[15] Robert Dunn is LVG's general counsel.  FF ¶ (A)(7).

told Ms. Avery and Mr. Binion that this was part of the bonus payment and told Mr. Binion she would pay the rest of the bonus later.  FF ¶ (C)(24-25).

The remainder of the bonus, however, never materialized.  Mr. Binion sent multiple messages to Ms. Jackson in July inquiring about the bonus.  FF ¶¶ (C)(26-33).  In her responses, Ms. Jackson never indicated she was unaware of the bonus.  *Id.*  Once it became clear that LVG did not intend to pay the remainder of the bonus, Mr. Binion once again reiterated in an e-mail that Ms. Jackson never said the $100,000 payment was the full bonus and that it fell short of what he was promised.  FF ¶¶ (C)(36-37).

This conduct — including offering Mr. Binion a bonus on a Teams call, encouraging and allowing him to procure samples based on this bonus structure, and authorizing a $100,000 payment which Ms. Jackson herself described as a "bonus" — is "clear, precise, and convincing evidence" of an oral contract modification that shows an intent to waive the requirement that any contract amendments be made in writing.  *See MDNet, Inc.*, 147 F. App'x at 243.  Further, LVG breached this contract by failing to provide the additional bonus payment, which resulted in money damages for Mr. Binion.  *See Ware*, 322 F.3d at 225.  Therefore, LVG breached its contract with GFIM to provide a bonus.  FF ¶¶ (C)(38-39).

The total bonus payment LVG owed to GFIM was $478,750.  FF ¶ (C)(40).  However, LVG already paid $100,000 of the bonus.  FF ¶ (C)(41).  Therefore, GFIM is entitled to $378,750 in damages.  FF ¶ (C)(42).

**b.  Ms. Avery had express authority to promise GFIM the bonus**

LVG argues that Ms. Avery did not have authority to offer Mr. Binion the bonus.  DI 72 at 18-19.  We disagree.  A principal may be bound by the actions of an agent if the agent had: "(1) express authority directly granted by the principal to bind the principal as to certain matters; or (2) implied authority to bind the principal to those acts of the agent that are necessary, proper

and usual in the exercise of the agent's express authority; or (3) apparent authority, i.e. authority that the principal has by words or conduct held the alleged agent out as having; or (4) authority that the principal is estopped to deny." *Bolus v. United Penn Bank*, 525 A.2d 1215, 1221 (Pa. Super. Ct. 1987) (citing *SEI Corp v. Norton & Co.*, 631 F. Supp. 497, 501 (E.D. Pa. 1986)); *Walton v. Johnson*, 66 A.3d 782, 786 (Pa. Super. Ct. 2013). "Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters." *Wisler v. Manor Care of Lancaster PA, LLC*, 124 A.3d 317, 323 (Pa. Super. Ct. 2015) (quoting *Walton*, 66 A.3d at 786). "[W]e look to facts to determine whether the principal expressly or impliedly intended to create an agency relationship." *Id.*

Here, assuming Ms. Jackson did not offer the bonus herself, she granted Ms. Avery express authority to offer a bonus to Mr. Binion.[16]  The bonus structure was proposed by Ms. Jackson and was offered to Mr. Binion on a Teams call that included Ms. Jackson, Ms. Avery, and Mr. Sood.  FF ¶¶ (C)(11-13).  Moreover, Ms. Jackson told Ms. Avery she planned to pay the bonus.  FF ¶ (C)(25).  Additionally, authorizing a payment of $100,000 that she described as a "bonus" indicates Ms. Jackson had previously given the authority to enter into the bonus agreement.  FF ¶¶ (C)(21-22).[17]

### c.  The contract is not void for illegality.

During the third day of trial, LVG suddenly raised a new defense: that the bonus agreement was "illegal" and "unenforceable" under the Eliminating Kickbacks in Recovery Act

---

[16] We note here that we find Ms. Avery's testimony highly credible on this point.

[17] Ms. Avery may also have had apparent authority to enter into the bonus agreement with Mr. Binion.  *See* FF ¶¶ (A)(8-10), (B)(1-4), (C)(1); *Bolus*, 525 A.2d at 1221 (noting that apparent authority is "authority that the principal has by words or conduct held the alleged agent out as having").  However, we need not reach this issue because we find Ms. Avery had express authority.

("EKRA").  DI 70 at 5-7; 18 U.S.C. § 220.[18]  Enacted to combat abuse stemming from the opioid

crisis, EKRA prohibits laboratories, and those who work with laboratories, from engaging in

illegal kickback schemes.  Laura F. Laemmle-Weidenfeld, *Navigating the Rocky Waters of the*

*Eliminating Kickbacks in Recovery Act*, *in Health L. Handbook* 12 (Alice G. Gosfield ed., 2022);

18 U.S.C. § 220.

We begin our analysis with the Federal Rules of Civil Procedure.  Illegality is an

affirmative defense that must usually be pled in a responsive pleading.  *See* Fed. R. Civ. P. 8(c)

("In responding to a pleading, a party must affirmatively state any avoidance or affirmative

defense, including . . . illegality.").  The affirmative defenses outlined in Fed. R. Civ. P. 8(c) are

"generally waived if not specifically raised 'by responsive pleading or by appropriate motion.'"

*In re Sterten*, 546 F.3d 278, 283 (3d Cir. 2008) (quoting *Elliott & Frantz, Inc. v. Ingersoll-Rand*

*Co*., 457 F.3d 312, 321 (3d Cir. 2006)).  LVG did not plead illegality as an affirmative defense in

its answer or raise it in a subsequent motion before trial.  *See* DI 8; DI 27.

The Third Circuit grants us some discretion to allow affirmative defenses raised later in

litigation — within certain parameters.  The purpose of Rule 8(c) is to "avoid surprise and undue

prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the

affirmative defenses should not succeed."  *Robinson v. Johnson*, 313 F.3d 128, 134-35 (3d Cir.

---

[18] LVG's stance on the role that EKRA should play in our analysis has somewhat shifted
overtime.  At trial, defense counsel made a motion under Fed. R. Civ. P. 52(c), arguing that we
should find for LVG on GFIM's breach-of-contract claim because the bonus was "illegal and
unenforceable."  DI 70 at 5-6.  We "decline[d] to render any judgment until the close of the
evidence."  Fed. R. Civ. P. 52(c).  In its initial post-trial brief, LVG characterized the agreement
as "*at worst*, criminally illegal and unenforceable," but included a footnote that argued illegal
contracts cannot form the basis of a cause of action and that this issue had not been waived.  DI
72 at 21 (emphasis added).  In its sur-reply, LVG characterized the contract as only
"***potential[ly]***" illegal and thus illustrative of the fact that LVG would not have entered into such
an arrangement.  DI 76 at 7-9.

2002).  Therefore, while affirmative defenses do not necessarily have to be pled in an answer,

they "must be raised as early as practicable, not only to avoid prejudice, but also to promote

judicial economy."  *Id.* at 137; *see also Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 506 (3d

Cir. 2006) ("[A]ffirmative defenses can be raised by motion, at any time (even after trial), if

plaintiffs suffer no prejudice.").

Here, LVG failed to argue the defense of contract illegality in its answer, summary

judgment motion, or even in its pretrial memorandum, and thus did not raise it "as early as

practicable."[19]  DI 8; DI 27; DI 50.  Additionally, GFIM suffered significant prejudice from

LVG's failure to raise the defense earlier.  LVG raised this argument for the first time on the

third day of trial after GFIM had already presented its witnesses, leaving GFIM without time to

prepare a defense to this argument.  DI 70 at 5-7.  Beyond the important problem of prejudice,

LVG's failure to timely raise the defense was wasteful of the court's and the parties' resources.

*See In re Frescati Shipping Co.*, 886 F.3d 291, 313 (3d Cir. 2018) (finding a party that failed to

raise a defense until years after the litigation began, and after the case had been to trial, waived

the defense, in part, because timely assertion of the defense may have avoided depositions, trial

testimony, and the damages phase of a trial).

Thus, if we viewed contract illegality merely through the lens of a tardily asserted

affirmative defense, we would find it clearly waived.  However, this does not end our inquiry

because, under Pennsylvania law, contract illegality is "a question not entirely controlled by the

rules of pleading."  *Am. Ass'n of Meat Processors v. Cas. Reciprocal Exch.*, 588 A.2d 491, 495-

---

[19] We disagree with defendants to the extent they argue they could not raise this defense
until they heard trial testimony.  DI 70 at 8-9.  Mr. Dunn testified at trial that he was alarmed
about this specific problem right when he heard about the bonus agreement.  FF ¶ (D)(3)(a)(ii).
We think it likely that it was a strategic decision not to advance the defense early in the case.
"We agreed to an illegal scheme" is not a particularly attractive defense in civil litigation.

96 (Pa. 1991).  The issue can be raised at any time — even post-trial — and courts should even raise it sua sponte.  *See id.* at 496 ("[*W*]henever it appears that the enforcement of a contract would violate public policy, the court should dismiss the proceedings of its own motion."); *Norristown Ford Co. v. Metro. Auto Dealer*, 132 A.2d 725, 726 (Pa. Super. Ct. 1957) (noting that "the question of illegality and its effect may be raised at the trial, as it was in this case, and also on appeal"); *Howarth v. Gilman*, 65 A.2d 691, 692 (Pa. Super. Ct. 1949) (allowing an illegality defense to proceed even though it was not raised in the pleadings); *Donadio v. Fonner Ins. Assocs.*, 2015 WL 9263435, at *3 (Pa. Super. Ct. Dec. 17, 2015) ("[I]t has been long settled that the defense of illegality is not waived if a party failed to invoke it."); *Rounick v. Neducsin*, 231 A.3d 994, 1000 n.6 (Pa. Super. Ct. 2020) ("[T]he issue of the legality of a contract can never be waived.").[20]

In *American Association of Meat Processors*, the Supreme Court of Pennsylvania explained that the court had previously applied:

> [T]he general rule that an agreement which violates a provision of a statute, or which cannot be performed without violation of such provision, is illegal and void.  Where a contract is found to be against public policy it cannot, under any circumstances, be made the basis of a cause of action.  The law when appealed to will have nothing to do with it, but will leave the parties in the condition in which it finds them.

588 A.2d at 495 (cleaned up).

As a federal court tasked with adjudicating a breach-of-contract claim,[21] we must apply Pennsylvania substantive law and federal procedural law.  *Schmigel v. Uchal*, 800 F.3d 113, 119

---

[20] Pennsylvania courts reached this conclusion despite the fact that illegality is listed as an affirmative defense under Pennsylvania Rule of Civil Procedure 1030(a) ("all affirmative defenses including . . . illegality . . . shall be pleaded in a responsive pleading.").

[21] While GFIM's complaint also includes a federal racial discrimination claim, we must apply Pennsylvania substantive law to the breach-of-contract claim.  *See Encore Int'l, Inc. v.*

(3d Cir. 2015). We are persuaded that Pennsylvania's rule that illegal contracts cannot form the basis of a cause of action — and therefore that this defense is not waived for failure to plead it — is a matter of Pennsylvania substantive law. *See Norristown Ford Co.*, 132 A.2d 726 (noting that "the legality of the transaction goes to the very basis of the plaintiff's claim"); *Shafer v. A.I.T.S., Inc.*, 428 A.2d 152, 493 n.1 (Pa. Super. Ct. 1981) (stating illegality of contract "goes to the very substance of plaintiff's action").[22]

This conclusion is supported by Third Circuit caselaw. Relying on *American Association of Meat Processors* and *Dippel*, the Third Circuit noted a defendant was "not barred" from contending contracts violated a statute, despite failure to plead this defense in its answer. *Dev. Fin. Corp. v. Alpha Hous. & Health Care, Inc.*, 54 F.3d 156, 163 (3d Cir. 1995). Similarly, the Third Circuit affirmed a district court opinion that noted "although illegality is an affirmative defense, if the illegality appears on the face of the contract, or from the opening statement of plaintiff's counsel, or from plaintiff's proof, the defendant could take advantage of it by proper motion, and if necessary the court will raise the objection itself." *Colonell v. Goodman*, 78 F. Supp. 845, 848 (E.D. Pa. 1948), *aff'd*, 169 F.2d 275 (3d Cir. 1948)*; see also Fitzsimons v.*

---

*Downey*, 343 F. Supp. 3d 459, 485 n.37 (E.D. Pa. 2018) ("When a federal district court exercises supplemental jurisdiction over state law claims, it applies the substantive law of the forum state . . . ."). Neither party disputes that Pennsylvania law applies to the breach-of-contract claim. DI 71 at 28; DI 72 at 18.

[22] Typically, with respect to affirmative defenses in diversity cases, "state law defines the nature of the defenses, but the Federal Rules of Civil Procedure provide the manner and time in which defenses are raised and when waiver occurs." *Morgan Guar. Tr. Co. of N.Y. v. Blum*, 649 F.2d 342, 344 (5th Cir. 1981); *Troxler v. Owens-Illinois, Inc.*, 717 F.2d 530, 532 (11th Cir. 1983); *see also Charpentier v. Godsil*, 937 F.2d 859, 863 (3d Cir. 1991) ("Matters treated as affirmative defenses under state law are generally treated in the same way by federal courts in diversity cases."). We read Pennsylvania law to stand for the proposition that the issue of contract illegality goes beyond the *procedural* issue of when an affirmative defense should be pleaded, and undermines a *substantive* breach-of-contract claim.

*Eagle Brewing Co.*, 107 F.2d 712, 713 (3d Cir. 1939) (noting "the defense of illegality was not interposed by a welsher but as, was not only proper but necessary, by the court sua sponte"); *Browne v. R&R Eng'g Co.*, 264 F.2d 219, 221-24 (3d Cir. 1959) (allowing a "tardily asserted" defense of illegality that was raised near the end of trial).

Thus, in spite of our reservations — and it must be said that we have no appetite whatsoever to indulge a defense raised on the third day of trial on a severely underdeveloped legal and factual record — we feel obligated to address whether GFIM's bonus agreement is illegal. In Pennsylvania, a contract is illegal when it "cannot be performed without violating a statute." *Rittenhouse v. Barclay White Inc.*, 625 A.2d 1208, 1211 (Pa. Super. Ct. 1993) (quoting *Dippel*, 74 A.2d at 114); *A.E.V., Inc. v. M.L. Harrold, Inc.*, 2014 WL 10979711, at *4 (Pa. Super Ct. Mar. 3, 2014); *Xian Dai Liang v. Hutnyk*, 2017 WL 2196991, at *1[23] (Pa. Super. Ct. May 17, 2017); *Printfly Corp. v. Nemeroff*, 2023 WL 6307635, at *8 (Pa. Super. Ct. Sept. 28, 2023). The key inquiry is whether the "subject of the agreement is specifically proscribed by statute." *A.E.V., Inc.*, 2014 WL 10979711, at *5 (quoting *Fitzpatrick v. Shay*, 461 A.2d 243, 458 (Pa. Super. Ct. 1983)); *Nichols v. Ferguson*, 2004 WL 868222, at *10 (E.D. Pa. Apr. 21, 2004). Where neither the "subject matter of the contract, nor its performance" is illegal, the contract is not necessarily void for illegality. *Xian Dai Liang v. Hutnyk*, 2017 WL 2196991, at *4 (quoting *Contractor Indus. v. Zerr*, 359 A.2d 803, 807 (Pa. Super. Ct. 1976)).

Proceeding with the illegality analysis, we begin by drawing legal conclusions about what is proscribed by EKRA — a relatively new statute not subject to much judicial interpretation. Next, we turn to whether GFIM's contract with LVG, including the bonus

---

[23] *Xian Dai Liang v. Hutnyk*, 2017 WL 2196991 (Pa. Super. Ct. May 17, 2017) affirms an opinion from the Court of Common Pleas of Philadelphia County, which is attached to the order.

agreement, "cannot be performed without violating" EKRA.  The dispute, such as it is,

essentially centers around whether a laboratory like LVG can legally compensate a consultant

like GFIM on a per-sample basis.

The EKRA statute states:

**(a) Offense**.--Except as provided in subsection (b), whoever, with respect to
services covered by a health care benefit program, in or affecting interstate or
foreign commerce, knowingly and willfully--

**(1)** solicits or receives any remuneration (including any kickback, bribe, or
rebate) directly or indirectly, overtly or covertly, in cash or in kind, in
return for referring a patient or patronage to a recovery home, clinical
treatment facility, or laboratory; or

**(2)** pays or offers any remuneration (including any kickback, bribe, or
rebate) directly or indirectly, overtly or covertly, in cash or in kind--

**(A)** to induce a referral of an individual to a recovery home,
clinical treatment facility, or laboratory; or

**(B)** in exchange for an individual using the services of that
recovery home, clinical treatment facility, or laboratory,

shall be fined not more than $200,000, imprisoned not more than 10 years, or
both, for each occurrence.

18 U.S.C. § 220(a).

While "[t]he starting point of all statutory construction is the text of the statute," *see G.L.
v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 611 (3d Cir. 2015), we do not "construe words
'in a vacuum,'" *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (quoting *Davis v. Mich.
Dep't of Treasury*, 489 U.S. 803, 809 (1989)).  "It is a fundamental cannon of statutory
construction that the words of a statute must be read in their context and with a view to their
place in the overall statutory scheme." *Id. (*quoting *Nat'l Ass'n of Home Builders v. Defs. of
Wildlife,* 551 U.S. 644, 666 (2007)); *see also Si Min Cen v. Att'y Gen.*, 825 F.3d 177, 192 (3d
Cir. 2016) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000))

("[W]e do not approach statutory construction as a myopic exercise, but rather as a holistic endeavor, in which we 'interpret the statute as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'").  Additionally, we follow "the common canon of statutory construction that similar statutes are to be construed similarly." *Lafferty v. St. Riel*, 495 F.3d 72, 81-82 (3d Cir. 2007).[24]

LVG's belated suggestion is that the contract contravenes EKRA by calling for paying GFIM to "induce a referral of an individual" to LVG.  District courts interpreting the EKRA phrase "induce a referral of an individual"[25] to a laboratory[26] have reached different conclusions. In *S&G Labs Haw., LLC v. Graves*, the court held a "commission-based compensation" structure which included percentages of net profits generated from "client accounts" did not violate EKRA.  2021 WL 4847430, at *2, *10-12 (D. Haw. Oct. 18, 2021).  In *S&G Labs,* the court looked to the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b, and specifically its definition

---

[24] We also note that because EKRA is a criminal statute, the rule of lenity counsels in favor of a narrower interpretation.  *United States v. Flemming*, 617 F.3d 252, 270 (3d Cir. 2010); *see also United States v. Thompson/Ctr. Arms Co*., 504 U.S. 505, 518 n.10 (1992) (noting that the rule of lenity can apply in a civil context).

[25] We note that there is no EKRA offense when payment is made to an employee or an independent contractor unless the payment varies by certain metrics, including "the number of tests or procedures performed."  18 U.S.C. § 220(b)(2)(B).  However, we focus on the language in 18 U.S.C. § 220(a), because if there is no violation of 18 U.S.C. § 220(a), there is no need to interpret 18 U.S.C. § 220(b).  *See also S&G Labs*, 2021 WL 4847430, at *12.

[26] Under EKRA, the term "laboratory" has been given the same meaning as the term in Section 353 of the Public Health Service Act.  *See* 18 U.S.C. § 220(e)(4); 42 U.S.C. § 263a(a). Laboratory thus means "a facility for the biological, microbiological, serological, chemical, immuno-hematological, hematological, biophysical, cytological, pathological, or other examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings."  42 U.S.C. § 263a(a).  *See also S&G Labs*, 2021 WL 4847430, at *10.  LVG is a "clinical laboratory" that "offers molecular and genetic testing services to healthcare providers."  FF ¶ 5.  Therefore, LVG is a "laboratory" within the meaning of EKRA.

of "person," which is "an individual, a trust or estate, a partnership, or a corporation," 42 U.S.C.

§ 1301(a)(3).  *Id.* at *10-11.  The court reasoned that the "clients" at issue — which were

"physicians, substance abuse counseling centers, or other organizations in need of having

persons tested" — were not "individuals" whose samples were tested at the laboratory.  *Id.* at

*11.  Therefore, because this person "was not working with individuals," his compensation

structure was "not paid to induce him to refer individuals" to the laboratory.  *Id.*

In *United States v. Schena*, the court disagreed with *S&G*'s interpretation of EKRA.

2022 WL 1720083, at *4-5 (N.D. Cal. May 28, 2022).  In *Schena*, marketers allegedly received

"illegal kickbacks and bribes" in exchange for blood samples and allergy testing after conveying

false information to physicians.  *Id.* at *1, *5.  The defendant argued that EKRA did not apply

because the marketers worked with physicians, instead of directly with patients.  *Id.* at *3.  The

court held that EKRA does not require a "direct interaction between the marketer and the

individual."  *Id.* at *4.  Instead, "[t]he plain meaning of 'to induce a referral of an individual'

includes situation where a marketer causes an individual to obtain a referral from a physician."

*Id.*

To understand the phrase "induce a referral of an individual" in EKRA, we find helpful

the meaning of nearly analogous language in the AKS.  The AKS states:

**(b) Illegal remunerations**

(1) Whoever knowingly and willfully solicits or receives any remuneration
(including any kickback, bribe, or rebate) directly or indirectly, overtly or
covertly, in cash or in kind--

    (A) in return for referring an individual to a person for the furnishing or
    arranging for the furnishing of any item or service for which payment may
    be made in whole or in part under a Federal health care program, or

    (B) in return for purchasing, leasing, ordering, or arranging for or
    recommending purchasing, leasing, or ordering any good, facility, service,

> or items for which payment may be made in whole or in part under a
> Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b)(1)-(2).  Thus, both the AKS and EKRA prohibit a person from knowingly and willfully paying remuneration "to induce" the referral of an individual for certain medical services.  18 U.S.C. § 220; 42 U.S.C. § 1320a-7b.[27]

When interpreting this language in the AKS, courts have distinguished between an "intent to **induce 'referrals,'** which is illegal, and the intent to **compensate advertisers**, which is permissible."  *United States v. Shoemaker*, 746 F.3d 614, 628 (5th Cir. 2014) (emphasis added).  Merely paying public relations professionals to distribute materials — such as literature, business cards, and cookies — to medical offices, then being compensated on a per-patient basis for this advertising, does not constitute a violation of the AKS.  *See United States v. Miles*, 360 F.3d 472, 479-81 (5th Cir. 2004).  In contrast, "exploit[ing] . . . personal access to . . .

---

[27]AKS and EKRA differ in other important ways.  Notably, the AKS applies only when payment may be made "under a Federal health care program," 42 U.S.C. § 1320a-7b(b)(1)-(2), while EKRA has no such restriction.  18 U.S.C. § 220.  Additionally, the situations in which EKRA does not apply, *see* 18 U.S.C. § 220(b), differ from the situations in which AKS does not apply, *see* 42 U.S.C. § 1320a-7b(b)(3).

executives," was held to violate AKS. *Shoemaker*, 746 F.3d at 629. The *Shoemaker* court explained that *Miles* stands for the narrow proposition that:

> Where advertising facilitates an independent decision to purchase a healthcare good or service, and where there is no evidence that the advertiser "unduly influence[s]" or "act[s] on behalf of" the purchaser, the mere fact that the good or service provider compensates the advertiser following each purchase is insufficient to support the provider's conviction for making a payment "to refer an individual to a person" under 42 U.S.C. § 1320a–7b(b)(2)(A).

*Shoemaker*, 746 F.3d at 628 (quoting *Miles*, 360 F.3d at 480).

Recently, in *United States v. Marchetti*, the Fifth Circuit reiterated that it is "legally correct to say that percentage-based compensation structures are not *per se* unlawful." 96 F.4th 818, 831 (5th Cir. 2024).[28] In order to establish that Marchetti — who ran an independent sales group — violated the AKS, the government relied for certain allegations "almost exclusively"[29] on the fact that Marchetti was compensated "based on the value of each referral." *Id.* at 821, 826 (quotations omitted). The Fifth Circuit held that "**[t]he structure of the contract alone is not sufficient evidence to produce a conviction under the AKS**." *Id.* at 826 (emphasis added). Rather, the government needed to provide some details about how Marchetti influenced those who make healthcare decisions. *Id.* at 827.

Other circuits upholding convictions for non-doctors who "referred" individuals within the meaning of the AKS carefully outlined the role of the non-doctor and their influence on the

---

[28] This particular section of *Marchetti* is commenting on jury instructions. 96 F.4th at 831. The Fifth Circuit held that while this is a correct statement of law, because the jury instructions made it clear that payments have to be made "in order to induce an unlawful referral" and that this "requires proof beyond showing that a percentage-based compensation contract existed," refusing to add this clarification was not an abuse of discretion. *Id.*

[29] The government did, however, show a violation of the AKS with respect to different allegations. *Id.* at 827.

referral process.  *See United States v. Vernon*, 723 F.3d 1234, 1255 (11th Cir. 2013) (noting this individual "had her own personal and existing relationships with her clients and decided where to fill her clients' prescriptions"); *United States v. Polin*, 194 F.3d 863, 866 (7th Cir. 1999) (stating that although the sales representative needed formal approval from a physician, "never in his fourteen year career" was his suggestion "rebuked" and that the "permission seemed to be more of a formality or rubber stamping" of the referral).[30]

Plain meaning supports the Fifth Circuit's distinction between "advertising" and an attempt to "induce a referral."  Black's Law Dictionary defines "referral" as "[t]he act or an instance of **sending or directing to another** for information, service, consideration, or decision."  *Referral*, *Black's Law Dictionary* (11th ed. 2019) (emphasis added).  However, it defines "advertising" as "[t]he action of drawing the public's attention to something to promote its sale."  *Advertising*, *Black's Law Dictionary* (11th ed. 2019).[31]  Thus, an attempt to "induce a referral" connotes a more active attempt to recruit individuals than does mere "advertising."

Turning to the contract at issue in this case, nothing on the face of the contract suggests that LVG contracted with GFIM for more than advertising and marketing services.  The contract is labeled a "Development and Marketing Services Agreement."  FF ¶ (B)(5).  It describes GFIM as "engaged in the business and practice of developing programs to market the services of various companies" and says it will provide "informational and support services" for healthcare

---

[30] In another case, the Fourth Circuit held that contracting with salespeople who obtained commission based on the number of sales made violated the AKS.  *United States v. Mallory*, 988 F.3d 730, 735, 738 (4th Cir. 2021).  However, the court did so on the basis of language not in EKRA.  *Id.* at 738.  Specifically, the court zeroed in on language in the AKS that prohibits individuals from paying or receiving remuneration for "arranging for or recommending purchasing" of healthcare services.  *Id.*; 42 U.S.C. §§ 1320a-7b(b)(1)(B), (2)(B).

[31] "Marketing" is similarly defined as "[t]he act or process of promoting and selling, leasing, or licensing products or services."  *Marketing*, *Black's Law Dictionary* (11th ed. 2019).

providers.  FF ¶ (B)(7).  It notes that LVG is "in need of certain development and marketing services."  FF ¶¶ (B)(8).  The services GFIM was expected to perform include: (1) sales and growth; (2) education and product training; (3) distribution management services; (4) account management; and (5) quality initiatives.  FF ¶ 10.  The oral modification of the original contract provided that GFIM would be paid a bonus based on the number of tests produced.  FF ¶¶ (C)(5)-(9).  It did not alter the *services* GFIM was expected to perform.  FF ¶ (C)(10 ).  Rather, it changed the *compensation* structure.  *Id.*  Therefore, like in *Marchetti*, the "structure of the contract alone is not sufficient evidence" to show a violation of EKRA.  There is not enough evidence here to show that GFIM was paid to influence healthcare decisionmakers — and thus, to "induce a referral of an individual" — as opposed to being compensated for advertising and marketing services.

Under these circumstances, we do not find that the agreement "cannot" be performed without violating a statute.  *Xian Dai Liang,* 2017 WL 2196991, at *1; *Rittenhouse*, 625 A.2d at 1211 (quoting *Dippel*, 74 A.2d at 114).  Rather, neither the "subject," nor the "performance" of the agreement — which includes providing marketing services and being compensated based on the success of those services — is specifically proscribed by EKRA.  *Contractor Indus.*, 359 A.2d at 807; *Xian Dai Liang*, 2017 WL 2196991, at *4; *see also Seligman & Latz of Pittsburgh, Inc. v. Vernillo*, 114 A.2d 672, 674 (Pa. 1955) (quoting *Harbison-Walker Refractories Co. v. Stanton*, 75 A. 988, 990 (Pa. 1910)) ("[T]he presumption is that [such] contracts are legal, not illegal, and the burden is on him who sets up illegality as a defense, on a suit to enforce a contract, to show how and why it is unlawful.").

This holding is a narrow one.  It is based on the limited — and somewhat unusual — record presented to us in this case.  Even though we had the benefit of a week-long bench trial,

because LVG did not raise the issue of contract illegality until mid-trial (and perhaps because LVG lacked some enthusiasm for proving its own illegal conduct), LVG left obvious gaps in the record.[32]  There is a certain irony in LVG's insistence that we must decide the question of illegality followed immediately by its calculated characterization of the agreement as merely having the "**potential**" to violate EKRA.  DI 76 at 7-9.  Thus, it is adequate here to conclude that, on the record presented to us, we do not find GFIM's contract void for illegality.

### d.  GFIM's contract was not terminated because of racial discrimination.

All people in the United States have the same right to "make and enforce contracts" and "to the full and equal benefit of all law and proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  This prohibition on racial discrimination includes the "termination of contracts." § 1981(b); *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994).

"To state a claim under § 1981, 'a plaintiff must allege facts in support of the following elements: (1) that plaintiff is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated by the statute, which includes the right to make and enforce contracts.'"  *Saunders v. Art Council of Princeton*, 2021 WL 6124315, at *2 (3d Cir. Dec. 18, 2021) (quoting *Brown v. Phillip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001)).  "In employment discrimination cases, these claims are subject to the same analysis as discrimination claims under Title VII of the Civil

---

[32] In addition to failing to flesh out important evidentiary issues, the parties did not examine whether the contracting individuals met the standard for "knowingly and willfully" exchanging payment to induce the referral of individuals.  The Third Circuit has approved of jury instructions defining "knowingly and willfully" in the AKS as a person who "knew his conduct was unlawful and intended to do something the law forbids." *United States v. Goldman*, 607 F. App'x 171, 174 (3d Cir. 2015).  It is unclear if either party knew their conduct was "unlawful" when entering into the bonus agreement.  We'll hazard a guess that even LVG's answer to this question would be an emphatic "no!"

Rights Act of 1964," which invokes the *McDonnell Douglas* "burden-shifting framework."

*Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (citing *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802-06 (1973)).

Under the *McDonnell Douglas* framework, a plaintiff must first establish a "prima facie

case of racial discrimination."  *McDonnell Douglas*, 411 U.S. at 802; *see also Burton v. Teleflex*

*Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).  Second, the burden shifts to defendant to "articulate

some legitimate, nondiscriminatory reason" for the termination.  *McDonnell Douglas*, 411 U.S.

at 802; *see also Burton*, 707 F.3d at 426.  Third, the burden of production shifts back to the

plaintiff to show defendant's justification is "merely a pretext for discrimination."  *Burton*, 707

F.3d at 426; *see also McDonnell Douglas*, 411 U.S. at 804.  Ultimately, the plaintiff must

"demonstrate by competent evidence that the presumptively valid reasons for [the adverse

action] were in fact a coverup for a racially discriminatory decision."  *McDonnell Douglas*, 411

U.S. at 805; *see also Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 523 (3d Cir.

1992).  Even assuming[33] that GFIM established a prima facie case under the *McDonnell Douglas*

analysis, it has not met its burden to show the "legitimate nondiscriminatory" reasons LVG

offered for terminating GFIM's contract were a "merely a pretext" for racial discrimination.

LVG offers the following reasons[34] for its termination of GFIM's contract: Ms. Jackson

and Mr. Dunn feared the bonus structure may violate EKRA and therefore posed a compliance

---

[33] We need not reach the issue of whether GFIM established a prima facie case of discrimination, but we note that this does not present a high bar.  *See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) (noting that there is a "low bar for establishing a prima facie case" of discrimination and that because it is "easily made out, it is rarely the focus of the ultimate disagreement").

[34] The burden to establish legitimate, nondiscriminatory reasons for termination is "relatively light" and is clearly satisfied here.  *Burton*, 707 F.3d at 426 (quoting *Tomasso v. Boeing Co.*, 445 F.3d 701, 706 (3d Cir. 2006)).

risk, FF ¶ (D)(3)(a), Mr. Binion used his Gmail account for work-related communication instead of a HIPAA-complaint e-mail account, FF ¶ (D)(3)(b), Mr. Binion did not always provide proper documentation with his samples, FF ¶ (D)(3)(c), Mr. Binion struggled to use LVG's portal to order supplies, FF ¶ (D)(3)(d), and Mr. Binion's performance declined, FF ¶ (D)(3)(e).

We find that LVG's reasons for terminating Mr. Binion's contract are credible.  We also note that LVG's concerns about Mr. Binion violating EKRA and HIPAA are legitimate reasons for terminating the contract, whether or not the bonus structure or Mr. Binion's e-mail behavior actually violated a statute.  *See Terrell v. Main Line Health, Inc.*, 320 F. Supp. 3d 644, 658 (E.D. Pa. 2018) ("The issue is not whether Plaintiff's conduct was actually a HIPAA violation, but whether the actual or perceived HIPAA violation constitutes a legitimate, nondiscriminatory reason for Defendant's decision to terminate Plaintiff.  As noted above, it does.")

Additionally, GFIM's evidence that racial discrimination was the real reason for his contract termination is unpersuasive.  First, we do not find credible Dr. Jasen Chi's deposition testimony, which stated that Ms. Jackson and Mr. Dunn made racially derogatory statements about Mr. Binion.  FF ¶ (D)(4).[35]  Without Dr. Chi's statements, GFIM presents a handful of comments that are, even in sum, not enough to convince us that racial discrimination motivated GFIM's contract termination — especially given the compelling, legitimate reasons LVG provided for GFIM's contract termination.

First, while Ms. Jackson saying, "I'm surprised, you speak very well," FF ¶¶ (D)(6-7), and Mr. Dunn telling Mr. Bennett that he wanted to work more with "the new guys," FF ¶¶ (D)(8-9), could be consistent with racial discrimination, they do not demonstrate it.  *See Miller v.*

---

[35] Among other reasons to disbelieve this testimony, Mr. Dunn produced telephone records that showed he received no calls from Dr. Chi.  FF ¶ (D)(5).

*Gen. Elec. Co.*, 562 F. Supp. 610, 618-19, 623 (E.D. Pa. 1983) (finding statements that plaintiff

"did not look like a shop manager" and that his performance trend was "reaching a plateau" were

not enough to show age discrimination); *Wilson v. Blockbuster, Inc.*, 571 F. Supp. 2d 641, 652

(E.D. Pa. 2008) (finding a statement that an individual could not be promoted because he had an

"urban look" did not infer racial discrimination).

      Second, Ms. Avery's descriptions of Ms. Jackson's statements about other people do not

lead us to conclude GFIM's contract termination was motivated by racial discrimination.  To

start, Ms. Avery's recollection of her conversation with Ms. Jackson about Mr. Williams is

cloudy — for instance, she added that Ms. Jackson called Mr. Williams "dumb" only on redirect

and said the timing of the relationship was "difficult to remember."  FF ¶¶ (D)(10-12).

Regardless, these statements were not made about Mr. Binion, nor were they made in the context

of discussing GFIM's contract termination.  *Id.*  Further, LVG's relationship with Mr. Williams

continued without incident after these statements were made.  FF ¶ (D)(13).  The same is true of

Ms. Jackson's statements about her Indian and Hispanic staff, which were not made about Mr.

Binion or about GFIM's contract termination.  FF ¶¶ (D)(14-15).

      Without more, these statements do not convince us that racial discrimination motivated

the termination of GFIM's contract.  *See Ezold*, 983 F.2d at 545 ("Stray remarks . . . by

decisionmakers unrelated to the decision process are rarely given great weight."); *Fuentes v.

Perskie*, 32 F. 3d 759, 767 (3d Cir. 1994) (comments that may demonstrate "insensitivity and

unprofessionalism" do not necessarily show discrimination); *Roberts v. Planned Bldg. Servs*,

2009 WL 367542, *4 (E.D. Pa. Feb. 13, 2009) (finding one use of the term "animals" in

referencing African Americans insufficient to establish prima facie case of disparate treatment,

without additional evidence that race played a role in decision-making); *Keller v. Orix Credit*

*All., Inc*., 130 F.3d 1101, 1111-12 (3d Cir. 1997) (statement "If you are getting too old for the job, maybe you should hire one or two young bankers," made outside of the context of whether plaintiff should be retained or fired, was not enough to prove age caused termination).

We also note that GFIM's treatment compared to that of Spirit, which is owned by a Caucasian man, does not persuade us that GFIM's contract termination was racially motivated. FF ¶¶ (D)(16-20).  Importantly, Spirit's contact with LVG was also terminated prior to the contractual end date.  FF ¶ (D)(19).  Additionally, GFIM provides no evidence to show companies contracting with LVG owned by African American individuals were terminated more frequently than companies owned by Caucasian individuals.  *See Terrell*, 320 F. Supp. 3d at 660 (finding no inference of age discrimination when of the nine similarly terminated employees, four were younger than the plaintiff); *Miller*, 562 F. Supp. At 621 (no inference of age discrimination when there were five managers over the age of forty and three managers under the age of forty).

In sum, to prevail GFIM must convince us "*both* that the reason [for termination given by LVG] was false, and that discrimination was the reason."  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 412-13 (3d Cir. 1999) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). GFIM has failed to do either and therefore has not shown that the legitimate reasons for its contract termination were "in fact a coverup for a racially discriminatory decision."  *McDonnell Douglas*, 411 U.S. at 805.[36]

---

[36] To be clear, we find that LVG did not discriminate against GFIM because of Mr. Binion's race in any other ways.  For instance, LVG chose not to pay Mr. Binion the bonus because of the above-listed nondiscriminatory reasons – most importantly, because LVG feared that the bonus may violate EKRA.

**V.**   <u>**Conclusion**</u>

For the above reasons, we grant judgement for GFIM on its breach of contract claim and deny judgment on its 42 U.S.C. § 1981 claim.  GFIM is entitled to $378,750 in damages on its breach of contract claim.  Final judgment is entered in a separate order.[37]

---

[37] In their pretrial memorandum, the parties allude to litigating an award of fees and costs.  DI 50 at 5-6.  To the extent appropriate, those issues may be pursued as usual.  Fed. R. Civ. P. 54.